Case vacated and remanded by
Supreme Court order filed 4/22/02

PUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

JOSEPH H. MENTO, III,
<u>Defendant-Appellant.</u>

AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES
UNIONOFTHE NATIONAL CAPITOL
AREA; AMERICAN CIVIL LIBERTIES
UNION FOUNDATION,
<u>Amici Curiae.</u>

No. 99-4813

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CR-98-70)

Argued: June 9, 2000

Decided: November 3, 2000

Before LUTTIG and KING, Circuit Judges, and
Richard L. WILLIAMS, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Luttig and Senior Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Alan Royce Lee Bussard, Towson, Maryland, for Appel-
lant. Joseph Lee Evans, Assistant United States Attorney, Baltimore,
Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United
States Attorney, Baltimore, Maryland, for Appellee. Dwight H. Sulli-
van, AMERICAN CIVIL LIBERTIES UNION OF MARYLAND,
Baltimore, Maryland; Ann Beeson, AMERICAN CIVIL LIBERTIES
UNION FOUNDATION, New York, New York; Arthur B. Spitzer,
Stephen M. Block, AMERICAN CIVIL LIBERTIES UNION OF
THE NATIONAL CAPITAL AREA, Washington, D.C., for Amici
Curiae.

_____

OPINION

KING, Circuit Judge:

Joseph H. Mento, III, was convicted in the district court of possess-
ing child pornography, in violation of 18 U.S.C.§ 2252A(a)(5)(B).
Mento entered a guilty plea to the charge, reserving the right to appeal
the lower court's determination that the statute, as amended by the
Child Pornography Protection Act of 1996 ("CPPA" or "the Act"), is
constitutional on its face. The federal courts of appeals that have con-
sidered this issue are split on its proper resolution. The First and Elev-
enth Circuits have upheld the Act against constitutional challenge, but
the Ninth Circuit has struck down the CPPA as an unlawful abridge-
ment of the free-speech guarantees secured by the First Amendment.
We conclude that the Act passes constitutional muster, and we affirm
the judgment of the court below.

I.

A.

In December 1997, the FBI received information from a confiden-
tial informant that Mento was in possession of child pornography;
federal agents thereafter obtained a warrant authorizing the search and
seizure of certain items in Mento's home. Upon execution of the war-

2

rant, Mento admitted to possessing child pornography, and he advised the agents how to access the material on his computer. The ensuing search of Mento's computer, external drives, and disks yielded more than one hundred images of naked, prepubescent children in sexually explicit situations. A number of these images depicted the children engaged in overt sexual acts with adults and with each other. According to a caption accompanying the images, one of the children was only five years old. Mento had downloaded the images from the Internet.

B.

1.

Since 1977, Congress has attempted to eliminate child pornography. See Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. No. 95-225, 92 Stat. 7 (1978). In New York v. Ferber, 458 U.S. 747 (1982), the Supreme Court held that child pornography is outside the scope of the First Amendment; thus, unlike pornography exclusively involving adults, child pornography may be regulated regardless of whether it would otherwise be considered obscene.[1]

In the wake of Ferber, Congress amended the federal child pornography law to include aspects of the Court's decision. See Child Protection Act of 1984, Pub. L. No. 98-292, 98 Stat. 204 (1984).[2] Four years later, after an investigatory commission found the Internet to be a popular medium for trafficking in child pornography, Congress outlawed the use of computers to transport, distribute, or receive such materials. See Child Protection and Obscenity Enforcement Act of 1988, Pub. L. No. 100-690, 102 Stat. 4485 (1988). Up to this point, most doubts as to what could constitute "child pornography" had been resolved by Ferber.

_____

[1] Although adult pornography is protected by the First Amendment, obscenity is not. Miller v. California, 413 U.S. 15 (1973).
[2] Among other things, the amendments replaced the word "lewd" with "lascivious" to describe an aspect of the banned materials; substituted the phrase "visual depiction" for "visual or print medium"; enlarged the definition of "minor" to include persons under eighteen; and brought non-commercial pornography within the ambit of the statute.

3

Then, in 1996, the CPPA was enacted to address the entirely new problems posed by technological advances. Congress was concerned, <u>inter alia</u>, with the practice of digitally altering photographic images to create child pornography out of innocent photos of children. <u>See</u> 110 Stat. 3009-26. Spurred by testimony that such material may be used by adults to entice children into sexual behavior, <u>id.</u>, Congress expanded the definition of child pornography to include not only altered pictures of identifiable children, but also depictions of what "appear to be" minors. This latter category encompasses wholly artificial images, created without the involvement of an actual child.

Hence, the term "child pornography" now includes "any photograph, film, video, picture, or computer or computer-generated image or picture" where:

> (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

> (B) such visual depiction is, <u>or appears to be</u>, of a minor engaging in sexually explicit conduct;

> (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or

> (D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that <u>conveys the impression</u> that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct.

18 U.S.C. § 2256(8) (emphasis added).[3] Whereas the first three para-

_____

[3] "Sexually explicit conduct" is defined as actual or simulated:

> (A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

> (B) bestiality;

4

graphs define child pornography by the essence of the depiction itself, the fourth focuses instead on the independent matter of how the depiction's presumed (but perhaps not actual) nature is communicated to third parties.

The statute prohibits the transportation of child pornography in interstate or foreign commerce (including the Internet), as well as its receipt, sale, distribution, reproduction for distribution, or possession with intent to sell. 18 U.S.C. § 2252A(a)(1)-(4). Mento was charged with violating a separate provision, § 2252A(a)(5), which criminalizes the mere possession of child pornography that has been transferred via interstate commerce.[4]

2.

Mento argues that the CPPA, as a content-based restriction on speech, cannot survive the exacting standards of strict scrutiny review. Moreover, according to Mento, the Act is impermissibly over-broad and vague insofar as it criminalizes any visual depiction that "appears to be" child pornography, or that is transmitted in such a way as to "convey the impression" of being child pornography.[5] The dis-

_____

(C) masturbation;

(D) sadistic or masochistic abuse; or

(E) lascivious exhibition of the genitals or pubic area of any person.

18 U.S.C. § 2256(2).

[4] An affirmative defense exists for those traffickers who can prove the material was produced using only adults, provided that the accused did not otherwise violate the statute by advertising, promoting, presenting, describing, or distributing the material in a manner to convey the impression that it contained a visual depiction of a minor engaging in sexually explicit conduct. 18 U.S.C. § 2252A(c). For those charged with simple possession of child pornography, that defense is not available; instead, an accused in Mento's shoes may avoid conviction by demonstrating that he (1) possessed fewer than three such images; and (2) promptly and in good faith destroyed or reported the images to law enforcement. § 2252A(d).

[5] Mento does not contest that he knowingly possessed images of actual minors. Indeed, we would uphold Mento's conviction even if we deter-

5

trict court denied Mento's motion to dismiss the indictment, adopting the reasoning of <u>United States v. Hilton</u>, 167 F.3d 61 (1st Cir. 1999). In <u>Hilton</u>, the First Circuit upheld the CPPA, ruling that the "appears to be" and "conveys the impression" language is neither so overbroad nor so vague as to render the Act unconstitutional. <u>Id.</u> at 71-77.

After judgment was entered against Mento in the district court, two other courts of appeals published decisions on the issues raised here and in <u>Hilton</u>. In <u>United States v. Acheson</u>, 195 F.3d 645 (11th Cir. 1999), the Eleventh Circuit aligned itself with <u>Hilton</u> in upholding the CPPA against constitutional attack. Shortly thereafter, however, a divided panel of the Ninth Circuit announced its disagreement with the rationale expressed in <u>Hilton</u> and <u>Acheson</u>, striking down the "appears to be" and "conveys the impression" language as unconstitutional on overbreadth and vagueness grounds. <u>See Free Speech Coalition v. Reno</u>, 198 F.3d 1083 (9th Cir. 1999). Mindful of the conflicting views that have emerged, we turn now to Mento's case.

_____

mined the statutory language in question to be unconstitutional; the statute could be severed accordingly. <u>See Free Speech Coalition v. Reno</u>, 198 F.3d 1083, 1086 (9th Cir. 1999). Ordinarily, we do not address the constitutionality of a statute on the ground that its application might be unconstitutional in a situation not squarely before us. <u>See United States v. Raines</u>, 362 U.S. 17, 21 (1960). Inasmuch as the issue on appeal implicates the free speech rights of the First Amendment, however, it raises the concern of self-censorship. Therefore, we decide the question of whether the CPPA, on its face, is unconstitutional. <u>See Dombrowski v. Pfister</u>, 380 U.S. 479, 486-87 (1965) (concluding that the "sensitive nature of constitutionally protected expression" permits the courts to determine the validity of statutes regulating speech without regard to the law's application in a particular case).

Mento's First Amendment attack on the CPPA encompasses the argument that the Act is impermissibly vague, a defect that is also alleged to be a deprivation of his Fifth Amendment right to due process. We note, however, that Mento does not possess standing to raise a Fifth Amendment claim; the severability of the Act deprives him of any legally cognizable interest in the outcome. <u>County of Los Angeles v. Davis</u>, 440 U.S. 625, 631 (1979). Mento's lack of standing in this regard is of little practical effect, however, in light of our decision to address the vagueness issue in the First Amendment context.

6

II.

We review de novo a challenge to the constitutionality of a federal statute. <u>Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Corp.</u>, 65 F.3d 1113, 1123 (4th Cir. 1995).

III.

A.

A "content-based" restriction on speech is subject to strict scrutiny review. <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989). A regulation is content-based if it is aimed at inhibiting the expression itself. Conversely, a regulation is "content-neutral" if it is designed to control only secondary effects resulting from the protected expression. <u>Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 49 (1986).

The CPPA bans an entire category of expression -- all child pornography -- based on its content. Blanket suppression of an entire category of speech unquestionably constitutes a content-based regulation. <u>Hilton</u>, 167 F.3d at 68. That the Act happens to further the government's interest in countering the secondary effects of child pornography does not render the statute content-neutral, inasmuch as the law manifests the lawmakers' disagreement with the message conveyed by the targeted speech. <u>See Boos v. Barry</u>, 485 U.S. 312, 321 (1988).**6**

_____

**6** The government argues that the CPPA is content-neutral insofar as the Act seeks to regulate the secondary effects child pornography has on pedophiles. In support of its view, the government cites the Supreme Court's decisions in <u>Renton</u> and <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277 (2000). The Court in these two cases deemed content-neutral local ordinances that, respectively, regulated the location of adult theaters and banned full nudity at dancing establishments. Neither of these ordinances, however, banned a form of expression in its entirety. Moreover, the Court has clarified that the <u>Renton</u> ordinance would have been content-based had it sought to prevent the psychological damage associated with viewing adult movies, thereby targeting the direct impact of a particular category of speech. <u>Boos</u>, 485 U.S. at 321.

7

B.

The First Amendment is the bedrock upon which our political system is founded; its affirmation of free expression permeates our very culture. Limitations imposed on speech because of its content are therefore subject to strict scrutiny, that is, no such limitation is valid unless it is narrowly tailored to serve a compelling government interest. Boos, 485 U.S. at 321.

1.

The Supreme Court has often recognized the government's compelling interest in protecting children from harm. See Santosky v. Kramer, 455 U.S. 745, 766 (1982); FCC v. Pacifica Found., 438 U.S. 726, 749-50 (1978); Ginsberg v. New York, 390 U.S. 629, 639 (1968). Moreover, the Court has specifically noted the existence of a substantial government interest in prosecuting those who promote the sexual exploitation of children. See Ferber, 458 U.S. at 761. The Court has also acknowledged the government's interest in closing the network of distribution for child pornography, in stamping out child pornography in the marketplace and for private possession, and in denying pedophiles and child abusers access to child pornography to seduce or coerce children into sexual activity. Osborne v. Ohio, 495 U.S. 103, 109-11 (1990).

The CPPA was designed by Congress to serve all of these interests. Courts and commentators have examined the legislative history of the Act, identifying its primary purposes as follows:

> (1) to prevent the use of virtual child pornography to stimulate the sexual appetites of pedophiles and child sexual abusers;
>
> (2) to destroy the network and market for child pornography;
>
> (3) to prevent the use of pornographic depictions of children in the seduction or coercion of other children into sexual activity;

8

(4) to solve the problem of prosecution in those cases where the government cannot call as a witness or otherwise identify the child involved to establish his/her age;

(5) to prevent harm to actual children involved, where child pornography serves as a lasting record of their abuse; and

(6) to prevent harm to children caused by the sexualization and eroticization of minors in child pornography.

See, e.g., Hilton, 167 F.3d at 66-67; Debra D. Burke, The Criminalization of Virtual Child Pornography: A Constitutional Question, 34 Harv. J. on Legis. 439, 452 (1997).

Mento nonetheless contends that the government's true purpose in combating child pornography has impermissibly shifted from preventing tangible harm to real children, toward eradicating certain ideas that it considers inherently evil.[7] Indeed, the government does not dis-

_____
[7] Mento maintains that the regulation of ideas -- even bad ones -- is per se unconstitutional. In support of this position, Mento cites American Booksellers Ass'n, Inc. v. Hudnut, 771 F.2d 323 (7th Cir. 1985). At issue in American Booksellers was an Indianapolis ordinance prohibiting certain types of adult pornography depicting women as subordinate. In striking down the ordinance, the court of appeals stated that "[u]nder the First Amendment, the government must leave to the people the evaluation of ideas." Id. at 327.

Mento's argument misses the mark. The Seventh Circuit invalidated the ordinance as contrary to the Supreme Court's admonition in Miller that only obscene depictions of adult pornography can be regulated out of existence:

True, pornography and obscenity have sex in common. But Indianapolis left out of its definition any reference to literary, artistic, political, or scientific value. The ordinance applies to graphic sexually explicit subordination in works great and small. The Court sometimes balances the value of speech against the costs of its restriction, but it does this by category of speech and not by the content of particular works.

9

pute that, because the CPPA purports to criminalize the possession of artificially created images, the intended scope of the Act's protection is not limited to actual children involved in the production of pornography. Mento maintains that this reach is improper in light of the Supreme Court's decision in <u>Ferber</u>, which, according to Mento, limited appropriate government interests to those designed to keep real children from being victimized by pornographers.

Mento interprets <u>Ferber</u> too narrowly. <u>Ferber</u> necessarily dealt only with depictions of actual children, long before virtual pornography became an issue. Viewed in the proper context, <u>Ferber</u> in no way stands for the proposition that permissible governmental interests in the realm of child pornography would be forever restricted to the harm suffered by identifiable children participating in its production.[8]

To the contrary, the Supreme Court has mandated that a degree of flexibility be reserved for the government to address new problems presented by the evolving nature of the child pornography industry. <u>See Ferber</u>, 458 U.S. at 756; <u>see also Osborne</u>, 495 U.S. at 103. Importantly, by denying child pornography First Amendment protection, the Supreme Court has made clear that "the prevention of sexual

_____

<u>American Booksellers</u>, 771 F.2d at 331-32. Child pornography, unlike adult pornography, is a "category of speech" that may, consistent with the Constitution, be utterly silenced. That one or more such depictions might have serious literary or artistic value, or be designed to express an "idea" of its creator, does not affect the constitutional calculus. If the material is in fact child pornography, it may be banned.

[8] <u>**Ferber**</u> protected "depictions of sexual conduct, not otherwise obscene, which do not involve live performance or photographic or other visual reproduction of live performances." <u>Ferber</u>, 458 U.S. at 765. This statement was not intended to limit government interests in the manner Mento suggests; rather, it was meant to limit regulation to those images that appear to be actual pornographic photographs-- excluding from prohibition cartoon images, for example. Though the <u>Ferber</u> Court noted that legitimate government interests would extend only to material that "render[s] the portrayal somewhat more realistic by utilizing or photographing children," the Court was again referring to the danger of censoring less graphic material, such as drawings. <u>Id.</u> at 763.

10

exploitation and abuse of children constitutes a governmental objective of surpassing importance." <u>Ferber</u>, 458 U.S. at 757. The government's interest in stamping out child pornography and denying pedophiles and child abusers access thereto extends beyond the protection of the children involved in making the pornography. The government instead aspires to shield <u>all</u> children from sexual exploitation resulting from child pornography, and that interest is indeed compelling.

2.

Congress may regulate protected speech to promote a compelling governmental interest so long as it selects "the least restrictive means to further the articulated interest." <u>Sable Communications of Calif., Inc. v. FCC</u>, 492 U.S. 115, 126 (1989). At issue here is whether, in executing the appropriate government interest, Congress can include in the definition of child pornography all sexually explicit depictions that "appear to be" of minors, or "convey the impression" of being minors.

The Supreme Court has approved as narrowly tailored the banning of child pornography, including its possession, in part because of the causal link between child pornography and the sexual abuse and exploitation of children. Therefore, the question is whether there is any substantial difference between child pornography in the traditional sense and child pornography where the minor is "virtual."

Congress has found that pornography involving actors who "appear to be" minors has all of the same effects on child molesters as actual child pornography.

> [T]he effect of visual depictions of child sexual activity on a child molester or pedophile using that material to stimulate or whet his own sexual appetites, or on a child where the material is being used as a means of seducing or breaking down the child's inhibitions to sexual abuse or exploitation, is the same whether the child pornography consists of photographic depictions of actual children or visual depictions produced wholly or in part by . . . computer.

11

110 Stat. 3009-26, -27. To the viewer, there is no difference between a picture of an actual child and what "appears to be" a child. Similarly, depictions that are represented to be minors are harmful in the same way as any child pornography, except that there is no minor involved in their production. See Hilton, 167 F.3d at 69 (noting the concern of Congress that a "child molester or pedophile [may use] the material to whet his sexual appetites," or show the material to child acquaintances to make them "more susceptible of acceding to sexual demands" (quoting S. Rep. No. 104-358, at pt. III, IV(A) (1996) (brackets in original)).

Logically, then, the connection between virtual child pornography and the sexual abuse of children is as powerful as the causal link that justifies the utter prohibition of pornographic images involving actual child participants. Unfortunately, technological advances have resulted in an enforcement problem, which the government refers to as an "epistemological conundrum." Without the benefit of the "appears to be" language in the CPPA, there is frequently a built-in reasonable-doubt argument as to the age of the participant, unless the government can identify the actual child involved. If the identity of the actor is not available, often the government can prove nothing more than the depiction "appears to be" that of a minor.

In light of recent improvements in technology, "efforts to eradicate the child pornography industry could be effectively frustrated if Congress were prevented from targeting material that appears to be of real children." Hilton, 167 F.3d at 73. We agree with the First Circuit that the statutory language "appears to be" cannot be improved upon while still achieving the compelling government purpose of banning child pornography.

The ban on material that "appears to be" child pornography or "conveys the impression" thereof may indeed affect some pornography where adults pose in a manner designed to simulate children. The government, however, has the same compelling interest in banning this material because it satisfies the audience for child pornography, resulting in the same negative effects on minors generally. In sum, we conclude that the CPPA represents the least restrictive means of advancing the vitally important government interest of effectively protecting minors from sexual exploitation and abuse.

12

C.

Mento next contends that the "appears to be" and "conveys the impression" language renders the CPPA unconstitutionally overbroad. In order for a statute to be invalidated on its face, its overbreadth must be real and substantial when judged in relation to the statute's plainly legitimate sweep. Ferber, 458 U.S. at 770. A statute is not overbroad unless it reaches a substantial number of impermissible applications. Id. at 771. The overbreadth doctrine should only be used as a last resort, and we must construe the statute, if at all possible, to avoid constitutional problems. Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973).

We agree with the First Circuit's rationale in Hilton that, although not explicitly stated in the statute, the "appears to be" language of the Act bans only those images that are virtually indistinguishable from previously banned photographic depictions; it does not outlaw items such as drawings, cartoons, or paintings. See S. Rep. No. 104-358, at pt. IV(C) ("[T]he appears to be language applies to the same type of photographic image already prohibited, but which does not require the use of an actual minor in its production.").

There is no question that the CPPA criminalizes certain images that resemble true photographs, but are in fact altered from various innocent and unrelated sources, and thus produced in a manner that did not harm any child. Consequently, the Act prohibits material that is predominantly the product of the creator's imagination -- an array of complex computer images whose composition requires a degree of artistic skill. Nevertheless, artificial depictions of child pornography that cannot be easily distinguished from the real thing do not deserve the protections of the First Amendment because,"like sexually explicit material produced with actual children, there is little, if any, social value in this type of expression." Hilton, 167 F.3d at 73.

With regard to "real" depictions involving young-looking actors of uncertain age, the Act offers an affirmative defense to sellers, producers, and distributors who can provide proof of the participants' majority. Admittedly, this defense is unavailable to mere possessors. See supra note 4. There is, therefore, a slight risk that a person could be

13

convicted of possessing "child" pornography that was actually produced using adults.

This risk could only be eliminated, however, if the statute were to offer safe harbor to possessors of teen pornography where the actors are not identifiable. Such an approach would do nothing to prevent the sexual exploitation of teenagers and other minors, and it would permit the market for child pornography to thrive. As a result, compelling government objectives -- including the protection of minors who may seem sexually mature -- would be thwarted. See Hilton, 167 F.3d at 76 ("[I]t is well within Congress's power to regulate virtual pornography of minors of all ages."); see also Acheson, 195 F.3d at 652 ("[S]exually explicit images falling close to the line separating adult pornography and unprotected child pornography are outside the most sensitive areas of speech vital to the free expression of ideas."). We thus concur with our sister circuits that the CPPA does not burden substantially more material than necessary to further the government's interest in prohibiting child pornography.

D.

To avoid being unconstitutionally vague, a statute must provide clear and adequate notice of the activity it prohibits. Although the Constitution does not impose "impossible standards of clarity" on Congress, ordinary people should understand the prohibitions, and the statute should not encourage arbitrary enforcement. Kolender v. Lawson, 461 U.S. 352, 361 (1983). With First Amendment issues, the undesirable effect of self-censorship makes this a heightened concern. Baggett v. Bullitt, 377 U.S. 360, 372 (1964).

We conclude that the CPPA provides clear and adequate notice of the activity it regulates, such that ordinary citizens and those charged with enforcing the law may readily understand what is prohibited. Because it meets the Constitution's specificity requirements, the Act is not void for vagueness.

First, the Act explicitly lists the elements of child pornography, specifies "minor" as a person under the age of eighteen, and particularly defines the sexually explicit conduct that will not be condoned. 18 U.S.C. § 2256(8). Precisely four categories of material depicting

14

such conduct are banned: actual pictures of actual minors, altered pictures of actual minors, pictures appearing to be of minors, and pictures that are represented to be minors.

Second, those who mail, transport, receive, sell, distribute, or reproduce the material are protected if they can show the actor was actually an adult and the material was not represented to be a depiction of one or more minors. 18 U.S.C. § 2252A(c). Because an affirmative defense is also available to those charged with mere possession, see supra note 4, it is highly unlikely that innocent persons who inadvertently stumble across prohibited materials will be convicted.

Third, the legislative history of the CPPA shows that by using the words "appears to be," Congress intended only to include those images "virtually indistinguishable to unsuspecting viewers from . . . [altered] photographs of actual children engaging in identical sexual conduct." S. Rep. No. 104-358, at pts. I, IV(B) (emphasis added). We do not understand the statute to criminalize any sexually explicit depictions that are not virtually indistinguishable from photographic child pornography.

Fourth, we believe the "appears to be" language connotes an objective standard. As in any felony case, the prosecution must establish the element of scienter to obtain a conviction. See United States v. X-Citement Video, Inc., 513 U.S. 64, 78 (1994). The jury must determine, based on all the evidence, whether a reasonable viewer would consider the depiction to be of an actual minor. If the jury required guidance in this respect, it could look to the manner in which the image was marketed to determine whether it is prohibited material. Hilton, 167 F.3d at 75. Of course, if the presentation were such that it "conveyed the impression" that the image was of one or more minors, that would provide an independent basis for conviction. But even then, it would be the jury's responsibility to ensure that a reasonable person would understand the specific impression sought to be conveyed. In any case, juries should have no trouble rejecting a prosecution of doubtful merit.

IV.

The CPPA is indeed bold and innovative in its attempt to combat the sexual exploitation of minors caused by the trade of child pornog-

15

raphy. Boldness and innovation, however, do not render an Act of Congress constitutionally infirm. We hold that the CPPA does not impermissibly regulate protected speech and does not, therefore, offend the First Amendment. Consequently, we affirm Mento's conviction of illegally possessing child pornography.

AFFIRMED

16